My name is Larry Hammond and with me this morning is my co-counsel Paula Harms from the Office of the Federal Public Defender's Capital Habeas Unit in Phoenix. We jointly represent Frank Atwood in this proceeding. There are four claims that we have brought before this court in the limited time available this morning. I would like to address primarily two of those claims. First, the ineffective assistance of counsel claim at sentencing a claim before this court because of the Supreme Court's decision in Martinez v. Ryan, a claim this court may consider assuming it finds cause and prejudice. We would also like to spend some time this morning on Mr. Atwood's Brady v. Giglio claim which is before this court under the AEDPA based upon our argument that the state court in this case made an unreasonable determination of facts under 2254d2. I would like, if possible, to reserve some of my time for rebuttal, but it's obviously very important to us given the complexity of this record that we address whatever questions the court might have. Let me turn first to the ineffective assistance of counsel claim. Our claim here, we think, is a very straightforward one. At the trial of this matter, Mr. Atwood's attorney spent very little time, indeed almost no time, preparing for and presenting the mitigation case on behalf of Mr. Atwood at sentencing. I urge the court to read that transcript of the hearing. It's only 83 pages. It took less than half a day. Mr. Atwood's trial attorney put on two witnesses, the father of Frank Atwood, General Atwood, and Frank himself. He did very little else. He presented to the court a cursory memorandum, but spent no time conducting any investigation. We preserved- Now, in terms of at the, the prosecutors were trying to go for three aggravating factors, correct? Yes. Initially. And the court only found one? That's true. Okay. So- And we thought that was a very important consideration because what it means is that in this case, we only have a single aggravator. And that single aggravator is one that we have also brought before this court. You have a claim about that. I realize that, yes. So- But obviously, I guess I'm pointing it out for the fact that if the prosecutors were going for three, and counsel got it down to one, that there's some significant success on that. It wasn't that all three were found to be true. Well, I'm sorry. I can't agree with that. I think that the- Well, it would have been better to find all three? No, they couldn't have found all three.  It clearly didn't meet the standards for that aggravator under Arizona law. And the prior felony also didn't meet. It was quite clear that there was going to be, at most, one aggravator. And that one, by the way, was identified by the prosecutor just before sentencing. Hadn't even been in the case until he got right up to the time of sentencing. So yes, it's good that there was only one aggravator. But it's also, I think, the most that that could have been. And the trial counsel, Mr. Bloom, knew, or certainly should have known, that there wasn't much there in terms of aggravation. One of the claims that, or one of the arguments raised by the government, is that had Mr. Bloom brought out more mental health evidence or put on a mental health expert, it would have opened the door to a whole range of rebuttal evidence that a reasonable attorney could strategically want to avoid. Could you address that? Yes. There are, I think, a couple of important points to be made about that. First of all, virtually all of the negative information that the state might have wished to use was already known to the judge in this case. And recall that this sentencing occurred at a time before Ring v. Arizona when we had judge sentencing. But the judge himself was well aware of that negative information. That's the first point. The second one is that Arizona law does not allow totally open-ended rebuttal. The rebuttal must rebut the aggravating, excuse me, the offered mitigating circumstance. And here, we submit and have argued in our papers that the court would not have been able to consider some of that aggravation that had nothing to do with the mitigation case that Mr. Atwood should have presented. That raises two questions for me. One, would you comment on the Atascadero records and their import? Yes. And then follow up on your last point and detail for us what you think would have been properly excluded in a rebuttal as not being related to the first round. Okay. The Atascadero records, we think, are important. The state had asked for them and had gotten them along the way sometime prior to trial. Those records, about 400 pages of records from a correctional institution, contained information that obviously would have been helpful in starting that process of doing mitigation. Okay. But you're not, but Mr. Bloom did look at those, correct? He said at the time of his trial or his hearing testimony in this case that he had looked at those. Yes. And in looking at those, what's revealed, of course, is a really big double-edged sword about how deep you want to get into those records and his statements and his past. And isn't that a judgment that Bloom made? Well, it was a judgment he claims he made, but he made it without conducting any investigation. The most he did was read through those records. He didn't look into the fact at all, and maybe the most important single fact was the very serious sexual abuse that Frank Atwood had suffered as a child when he was... But it is double-edged in the sense that there's evidence that indicates that he makes statements that he actually enjoyed it. And there is evidence that he didn't have post-traumatic, that he wasn't traumatized by that particular event. So you have a person that you can portray in two ways. And I think if Valmontes was a case before this Court that went to the Supreme Court where the majority criticized the defense counsel for not trying to put more mitigating evidence in, but what would have come in is that Valmontes had committed a prior sort of a murder that would have come up. And so the Supreme Court reversed the Ninth Circuit and said, hey, you know, you open the door, then this other stuff comes flying in, and you have that situation here. There are certain things, as Judge McKeown used the double-edged sword, that would put your client in not a positive light for the trier of fact on mitigation. But, Your Honor, the first thing we would submit any competent lawyer needed to do was to talk to a mental health provider. A mental health provider, as far ago as the trial in this case, would have helped Mr. Valmontes, who had a two-edged sword, actually may be perfectly consistent with the claim that this man suffered from a very serious mental health set of problems, PTSD being, as we've said, one of them. But the mere statement that someone is recorded as having enjoyed being sexually assaulted isn't the end of an inquiry. It's what calls for, one of the things that calls for the investigation. Right, but we have to look at this under an AEDPA lens, correct? I'm sorry, ask that question? We have to look at this under an AEDPA lens. No, I do not believe so. I believe that this case is governed by the standards developed by the Ninth Circuit after Martinez v. Ryan came down. So if we found that... And I think in Dickens, excuse me, Your Honor, I believe that's what Dickens... So AEDPA doesn't apply at all here? I believe that's right. So if we found cause and prejudice for purposes of Martinez, then we would review the claim de novo, is that what you're saying? Yes, that's exactly what our findings... So I understood when I was looking through the materials that the defense mental health expert was unable to testify that Mr. Atwood probably had PTSD at the time of the offense. She was indicating that she could only say that at this point he had symptoms of PTSD. How does that affect our analysis of that issue? I believe what Dr. Schwartzwatz, who was our expert, said was that she couldn't say conclusively because of the passage of time. But there are many indicators to her, which she detailed in her report and in her testimony, that demonstrated to her that in fact he probably did have PTSD at the time of the offense. I read it quite differently, more like the district court, that it was more likely it was post-incarceration. What the district court said, even assuming that he would have cooperated with the mental health expert, the likelihood is the expert would have found that at the time of the offense, there was little likelihood that the expert would have found PTSD at the time of the offense. I know you disagree with that, and why do you disagree with that? We do because of all of the records that were presented ultimately at the hearing, which could have been presented at the time of trial, would have shown that this young man, if you look at his story, he goes all the way up to about age 14. Everyone says that he's off to a good start. But then we find out that his mother has a serious mental illness problem, that he has been seeing a psychologist himself since he was a very young child, and that at about the same time that he was sexually assaulted and then had to go testify about being sexually assaulted, he then started to go precipitously downhill into a life of drug abuse and misbehavior, serious misbehavior. All of those things we submit, and Dr. Swartzwatts, I think, testified, would have been powerful indicators. Whether you call it PTSD or not, certainly it would have been powerful, particularly in light of the fact that, as I said earlier, we have only this single aggravator, an aggravator which itself should have been deemed unconstitutional. So at that hearing where Dr. Swartzwatts testified, I think the state put on, was it Dr. Nelson? Yes, Dr. Erin Nelson. And she said she didn't see indications of PTSD, at least earlier indications, but she diagnosed him as being anti-social personality. I think that we commonly say like a sociopath, correct? So I guess one of the thinkings of the district court is that's powerfully aggravating testimony that you reasonably could decide not to open the door to. Do you disagree with that? Yes, we do, for a couple of reasons. One, the amount of knowledge that the trial lawyer had of any of this is almost non-existent. So we're looking hypothetically at what might have been said. But I think even through that lens, if you look at Dr. Nelson's testimony, and I would urge the court to read carefully her cross-examination, on point after point after point, she acknowledged that indeed a finding could have been made, whether she ultimately might agree with it or not. She was very fair, I thought, in her assessment that all of these things that we had brought forward could very well have been factors relevant to determining whether he had suffered from the very serious mental problems that we've identified. And the court thought that the diagnosis of an anti-social personality was something that would have an influence on the sentencing court as a negative factor. And we have some cases that do suggest that. What do we do with that? Well, again, I think it is so important to understand the help that qualified experts could have brought to this. Simply labeling something anti-social personality disorder isn't the end of a properly done mitigation case. You need to look beyond that. I mean, ASPD is itself a disorder. At least it is a basis for saying this man had problems. If you look at the sentencing record, you can get no indication at all. But it's not a very good label. It's almost like they're saying you're evil. Well, that's what prosecutors... And being evil is not something that, you know, even though it is a psychological, they don't... It isn't one of them. It's different than the type where people maybe hear voices or PTSD or things along those lines. Anti-social personality doesn't necessarily... That can be a person that otherwise functions, can premeditate, can plan things, knows exactly what they do, all of those things, but they're just evil. That doesn't... That's a double-edged. Well, wouldn't you agree, though, Your Honor, that if you knew the major touch points of his history, you would at least, I think, have to seriously pause and consider whether there are explanations for... I mean, if you want to call him evil, okay, call him evil. But anti-social personality and sociopath, those type carry a different connotation than someone that has hallucinations, someone that's got schizophrenia, someone that, you know, that it possibly interferes with other functions. So I guess in terms of what I'm just saying, to say that it can only be looked at one way, I don't think it can only be looked at one way. I'm not intending to suggest to this Court that there is only one way to look at these things. I understand that there would be some rebuttal, and some rebuttal might be permissible under Arizona law. But to say you're better off not even investigating, you're better off not even knowing and assessing what you're dealing with, with a man who has clearly been the most vilified human being in southern Arizona for years in a case that was the first televised trial, people thought he was Charles Manson. And yet when you get to sentencing, nothing is done to really tell the story of this young man's life. I know you want to reserve time for rebuttal, but you also wanted to address the Brady and Giglio, and so I just wanted to call that to your attention. Thank you very much. I'm going to take just a minute on the Brady thing, because I think I should reserve some time. But the important issue on Brady, which is an EPA claim, we claim on this one that the state court failed to make a reasonable determination of facts. And I beg the court to look carefully at the trial court rulings. You've got thousands and thousands of pages of material that have been developed. Three or four thousand of those pages were given to the state court. The rulings are three-minute orders. So what evidence would Mr. Atwood present at that point? Just before you add that question, can we just hear your list of what you particularly want us to focus on on those three-minute orders? Do you have record sites? Sure. What is not in them? There is no finding of fact with respect to the claims that we've made. The court doesn't address our specific issues other than to say he thinks in total that they're speculative. But we go through a very lengthy process of explaining what we have found. We try to explain to the court that it wasn't essential that we even have an expert, but we had people who were. When the court doubted whether Mr. Hill, the first person who had worked on these photographs, was really qualified, although she never, I'm sorry, he never met Mr. Hill. We never had a hearing of any kind. I never even met the judge, and we were before him for over two years. But we went out and got a second expert to look at the methods used in the photographic analysis, Dr. Hulick. Well, this judge dismisses Dr. Hulick in a sentence, does not address the fact that Diana Hulick, who is a very well-qualified expert unquestionably, had said that the methods Mr. Hill used were appropriate. And then the one other thing that I think needs to be said is that during the course of that work, we began to develop more information about what's called the reconstruction, which is this very carefully documented story at trial that the prosecution used, that the bicycle had been hit. Did you depose police officers on this, though? You did at some point, didn't you? We didn't depose them. We entered into an agreement with the state to informally interview four people, and we did that. They were not under oath. We wanted to talk to the FBI agents, because I think they would be very helpful on this claim, but they declined to be examined under oath. Am I correct that we don't have in the record the actual FBI paint analysis, other than a testimony about it? Well, there is in the trial. In other words, not a lab report? There was at the time of trial. The gas chromatography that had been done by the FBI crime lab was in the trial record, and it still is there. Could be. But that's not something you've put on appeal? No, it's not an issue that we have raised in this proceeding. Well, it is and isn't in the sense of you talking about the paint, right? Yes. Let me make sure I understand the essence of your paint theory, and that is that the paint wasn't really discovered the first time around, that the bumpers got detached, shipped somehow by airplane or whatever to Arizona, that the bike then appeared with the bumpers, and then the paint arrives, and that even if there was some pink paint, that it was contaminated in some way and mixed with something. Is that a fair statement? Well, the mixture is a little more subtle than that. There was a yellow substance that the FBI agent described as a smear. His name is Klofka. He was asked in his interview, was it a line or a smear? He said, no, it wasn't a line. It was a little smear. That went into a matchbox. Our theory is that the line of paint was put on the bumper later, and then... I got that, but when I got done following the trail and looking at all the pictures carefully, which have been nicely cataloged for us, and reading the interviews and looking at the timeline, to be honest, I was hard pressed to figure out why all this wasn't speculative also. Maybe in short order, you can tell me what is the best evidence as opposed to theory that would confirm what your argument is. Well, I think that the best evidence we have of that is that that bumper that we've talked about is this bumper. There's no doubt about that. It's on the dock of this property and evidence room. The reflection of the bicycle is in that photograph, and we've given the court a copy of this. Is that a dated photograph? This one is one that we've dated. No, I understand that you've dated it. It was undated. Right. So, again, you had a bumper, and let's just say that is the bicycle. I don't know if it is or not, but let's just say it is the bicycle. I don't understand why that in and of itself is damning, unless you can establish the whole So, in and of itself, it didn't seem to me to, quote, reflect anything other than a possible reflection, giving you the credit on that. The thing that makes this, in our minds, a very worthy claim to pursue is that in addition to those photographs, we also found negatives that were photographs taken by the first lawyer, Lamar Couser, who showed up on the day that the bumper and the bicycle came back from Washington, D.C., and he photographed everything that day. Those are self-authenticating. You can see the dates on there, but if you look at the bumper on that day when it comes back from D.C., it's clearly not in the same condition. The road grime is different. The cowling is different. The license plate has been folded differently. The plastic that the bumper was in is different plastic. So that, to us, authenticates that, in fact, these two items couldn't have been together at any time. These two items meaning the bumper and the bike? The bumper and the bicycle. And when you say couldn't have been together at any time, you mean starting from the point at which it's argued that the car bumper hit the bike the little girl was on? Yes. The records, which no one is able to dispute, show that the bicycle was sent to Washington, D.C., on the 26th of September, that the car itself didn't get to Tucson until a couple days after that, at which time the bumper was sent. So when the car got to Arizona, the bicycle was already gone. There should therefore have been no time when those two things are together. And these photographs were in the state's file. They were not produced at trial, as far as we can tell. So you said this is subject to review, right? Yes, it is. All right. And so the court said it was speculative. What is your theory of this? Right. Is there a theory, another theory that the court, what was the court's other theory? It's really a matter of process. The court never held a hearing. Well, I guess on that, what evidence would you have put in that wasn't already before the state court? Well, the court said it couldn't see anything in the photographs. It couldn't see the things that we said supported our view. These photographs do take some manipulating so that you can... So what other evidence is there, other than the photographs of the bumper, to support Mr. Atwood's claim of law enforcement misconduct? What other evidence is there? Well, there is the entire chronology, and there is the testimony of the FBI agents that when they first examined the car in Kerrville, Texas, they found no paint. They didn't see anything that looked like paint. I don't think that was quite the testimony, was it? Was it that at that time they didn't note it? They didn't say they didn't see it. They said that it wasn't noted, and then they went back and... It is true. They say it wasn't noted, Your Honor, but we know that the FBI had been in touch with law enforcement in Tucson and that they were looking for anything that brought those two items into contact with each other. Thank you. Sir, I think my time is just about up. It is. I will reserve 36 seconds. Okay. Actually, it's a little confusing on the clock, but you're 36 seconds in the hole. I'm not going to hold it against you. I'm going to give you some rebuttals. Thank you. May it please the Court. My name is Lacy Gard. I represent Charles Ryan in this appeal. I'm from the Arizona Attorney General's Office. I'm going to start out addressing the Martinez issue, the ineffective assistance claim. I think there are some points that Mr. Hammond made that I'd like to respond to. And as the Court is aware, we did argue, I argued at length in the brief, that the district court did not abuse its discretion in denying Mr. Hammond's motion to amend the habeas petition to raise this claim. And I'm glad to answer any questions that the Court may have on that. But otherwise, I'll just go straight to the merits of the claim. And I do agree, unfortunately for me, with Mr. Hammond, that unfortunately we don't have AEDPA deference in this case because we are under Martinez. But we do have Strickland deference, which means that the question that the district court looked at and the question that this Court should look at is, could a reasonable attorney in Mr. Bloom's position have elected not to pursue mental health evidence? And was Mr. Atwood prejudiced by the failure to pursue mental health evidence? So if mental health evidence had been presented, is there a reasonable probability that the Court would have imposed a life sentence instead of a death sentence? I think that the, really the… I have a question. So at this time, it was a judge that did this? It was a judge sentencing, yes. Okay. Does it matter whether it was a jury or a judge in terms of when you discuss those things? In terms of discussing prejudice? Would it matter? Well, I think because I think what he was saying was the judge already knew all this stuff anyway, so it wasn't a problem to talk about it. Whereas a jury wouldn't have known that stuff already. And in terms of like Belmonte's, for example, that was the jury was deciding the penalty phase. And a jury finding out that someone had committed a prior murder, if you brought in more people to say what a good boy he was, is pretty devastating. Right. I mean judges hear all this stuff and then they say they're not going to consider it, but he's saying the judge already knew all of that, so he didn't really need to worry about the judge being prejudiced, I think. Well, the judge did know all of it from the pretrial motions, and it's notable the reason he knew all of it was because Mr. Bloom went to such great lengths to try to keep this evidence away from the jury and out of evidence. But, yeah, I do think that we can presume that the judge didn't consider what he had already excluded because Mr. Bloom didn't present anything that made it relevant for consideration. And, in fact, specifically with respect to the prior kidnapping that Mr. Atwood had done on the little boy in 1980, I recall that the judge said that he considered those facts irrelevant because the prosecutor tried to cross-examine Mr. Atwood on them at sentencing and Mr. Bloom's objection to that was overruled. The fact that only one aggravating factor was found and three were alleged, counsel for Mr. Atwood seems to say, well, that was a foregone conclusion. There was no way that you could find this to be a cruel and heinous crime. I disagree vigorously with the cruel and heinous aggravator. With the kidnapping aggravator, I think it was written differently back then, and so there was some law that was against the state on that. But as far as the cruel and heinous aggravating factor, the prosecutor, as I recall, had intended to prove that through testimony from a jail informant that Mr. Atwood had confessed to. And Mr. Bloom successfully was able to get that confession suppressed. So is the cruel and heinous part of it that because of the circumstances of this and when the body was found, which was significantly later, the prosecutors were not actually able to prove that she was sexually assaulted? That's correct. That's correct. There was no medical evidence that she was sexually assaulted, but Mr. Atwood did tell the informant that she was. So that if the court had been willing to entertain that and believe that, then your argument is that that could have supported that. Absolutely. But the court... That was excluded. Yes. Okay. I'm sorry. Part of the argument, when you boil it to its essence, is that lawyers are smart, but they're not mental health experts. And so you have the Atascadero records and maybe you look at them and say, well, it could be a problem, but you don't have a mental health person really interpreting those. And what's missing here is a nuanced view of evidence that could be significant on mitigation. And the lawyer, after the fact, kind of covers his tracks and says, well, I thought of this and I thought of that. But he never really gets mental health advice. So what is the State's response to that in terms of Strickland? Well, I understand the argument that there's no harm in looking for a mental health expert, but I think Mr. Bloom's testimony makes clear that he had gone through those records pretty carefully and he had seen that there were myriad antisocial acts captured in them. There was a diagnosis of pedophilia that's in the records. And, in fact, that's what Mr. Atwood's treatment was directed at, was pedophilia, because he had, at that point, had two offenses against minors that he was convicted of. And Mr. Bloom, I think, decided that he wanted, at all costs,  And the other part of what went into his thought process was the fact that Mr. Atwood had indicated to him that he did not want to have his sexual history put before the court. He did not want to have his mental health put before the court. But we hear that all the time from defendants, and that doesn't absolve the lawyer from the lawyer's duty. And that's true, but it is a factor that goes into the analysis. And Mr. Bloom's impression was that Mr. Atwood would either refuse to cooperate with the mental health evaluator or that he would cooperate with the mental health evaluator but might say something very inflammatory, as he had said in the past, and he's well documented going on record, around the time of this offense with such beliefs as that sex with children should be legal. He had said that to multiple people. So Mr. Bloom testified that he was very worried about what Mr. Atwood might say. But I think with respect to those records, we can look back in hindsight and say, well, maybe Mr. Bloom should have gotten a mental health expert to look at them or at least give him some advice. But the question is whether an attorney standing in his position, looking at those records that are very damaging, would have said, this is not an area I want to go into, especially when combined with his client's attitudes towards mental health evidence and towards the general subject matter at issue in the case, that being crimes against children. And, of course, we know now from, well, we sort of know from the evidentiary hearing what a mental health investigation would have produced. And I think it's dispositive, frankly, of Mr. Atwood's claim that Dr. Schwartz-Watts could not say that he had PTSD at the time of the offense or at the time of sentencing. She couldn't determine when he would have developed that disorder. So we don't even know. Mr. Atwood failed to show that there is any reasonable probability that a mental health expert would have even diagnosed PTSD at the time of the sentencing. So what that leaves us with is really a sexual assault against Mr. Atwood when he was 14 years old. And how mitigating that would be in the context of this case, where he is accused of an increasingly violent pattern of sexual offenses against children, I think a reasonable attorney could decide, very easily decide, that that's double-edged and not present it at sentencing. There was some statement in there about an action that he'd had with a 4-year-old child. Where was that located exactly, and what age was he when that occurred? I believe he was 16 years old. I think that was the juvenile offense. Yes, I believe it was in 1972, if I recall correctly. Yes, that was his first one. And then there was the second was against, I believe she was maybe around 10 years old, a younger female, and that's what sent him to Atascadero State Hospital. And then he was paroled, or he was sent back to prison to complete his term after being deemed basically not rehabilitatable. And once he gets out of prison, he offends again with the young boy. And what's notable, I think, about this pattern, and this goes to the prejudice question as well, because I think once you present mental health evidence and you say he has PTSD and a state's expert comes back and says, no, I think he has antisocial personality and I think he has pedophilia, once you go down that road, all of this becomes relevant. And so this increasing pattern of violence that he showed towards children would, I think, be devastating to rebuttal to any mitigation evidence, because the second offense against the little girl was a groping and kissing offense, but the offense against the little boy was very violent. And, in fact, he threatened to kill that child. And then, as we know, he gets paroled on that offense. He tells his friend in Oklahoma that the next time he'll make sure the child doesn't talk, and then here we are with the dead victim here. So when you look at the whole complexion of his life, are there mitigating facts that you could pick out of that Atascadero records or that a mental health expert might offer? Sure, but are they outweighed by this other very damaging evidence? And I think that a reasonable attorney could easily have concluded yes. And also I think that, in light of the whole entirety of the evidence, that it's So how much of that was he actually able to keep out of by not going into what counsel is now saying he should have gone into? Well, certainly the facts of the kidnapping in the court said were irrelevant. Mr. Atwood, I understand, has made the argument that some of this information was in front of the court through the pre-sentence report, and that's accurate. There was some of that information in the pre-sentence report. The judge, however, did not mention it in his special verdict, and also Judge Kuhnauer pointed out in his order that nothing that Mr. Bloom presented at sentencing would have made that information particularly relevant for rebuttal because Mr. Bloom kept his presentation so tightly circumscribed. But, and even if it is, just to respond briefly to the argument that it was in the pre-sentence report, that's a very sanitary presentation of those facts. So there's a big difference between having an expert come in like Dr. Schwartz-Watts and Dr. Nelson and talk in detail about what he did to, for example, the little boy, and having that set out kind of in a cold record. I wanted to ask you about we, having directed the State to file a brief in response to Mr. Atwood's uncertified law enforcement claim, misconduct claim, should we determine that the claim is not meritorious, or could we either deny a certificate of appealability or grant the certificate and deny the claim on its merits in light of the Supreme Court's recent decision in Buck v. Davis, just Arizona? I'm curious what your position is on that. I mean, I'm not saying what our position is, but it creates a little bit of, Buck sort of creates an interesting road to walk. And I guess my understanding was that the Court had already granted the certificate of appealability? That's right. Yeah, we did. Okay, that was my understanding. And so I guess my answer to that would be that you should simply deny the claim because the State Court's decision rejecting it was reasonable, and Mr. Atwood can't satisfy AEDPA on that claim. And I'm happy to turn to that if the Court doesn't have additional. Could you please? Yes. Yes, and it seems that Mr. Hammond's primary complaint, at least as I understand it with the rulings below, is that there was no evidentiary hearing conducted in State court or in Federal court. And, of course, in Federal court we're bound by AEDPA and Penn-Holster that Judge Kuhnhauer could not consider new evidence to resolve the claim because the State courts had rejected it. So the question is whether the State court decision rejecting that claim was reasonable. And I think the Court questioned Mr. Atwood, or I'm sorry, Mr. Hammond, at some length about why the claim was not speculative, and I don't think we've really heard an answer to that, or at least I haven't. Because the way I look at this claim is that there are a set of photographs which Mr. Atwood admitted this morning, I'm sorry, Mr. Hammond admitted this morning, were not dated and they have not, in my view, been authenticated in any way. I understand Mr. Atwood's trying to authenticate them through the level of dirt on the bumper, but that to me is not terribly persuasive. And then we have another. Well, that isn't really authentication. That's just what does the, you know, the photographs are what they are. So they are, in effect, authenticated given the source, et cetera. The question is what does the evidence show? Right, and that is a better way to put it. That is a better way to put it. And on that topic, and I'll turn to the, I think this is what Mr. Atwood considers the most critical photograph, which is PSDR 32, which is the reflection, or the alleged reflection. And I guess the question really is was it reasonable for the state court to look at this photograph as well as the others that Mr. Hammond submitted and conclude that they don't support the inference that the police planted the evidence on this bumper? And I think that that is an eminently reasonable conclusion. So Dr. Hulick, I think, in addition to Mr. Hill, in her view, the bumper showed a reflection of the bicycle. Isn't that correct, Dr. Hulick, so testifying to her affidavit? Yes. So I guess it's do you believe the expert or your lying eyes is the question. I mean, if we have an expert testifying as to what can be seen by the photo, is that dispositive for the court, for the state court? No, I don't think that is dispositive. I think the photograph speaks for itself, especially when it's something as ambiguous as this is, when it's been enhanced and it's being presented with arrows and sketches and things to try to explain it. But the other part of this is that even if this does show that reflection, the bumper and the bicycle, we still don't have any credible evidence of when it was taken. And it would seem to really defy logic for this scheme to have happened. I don't understand how it happened in the first place, because the bumper was in the custody of the FBI when it was supposedly removed, and there doesn't seem to really be any motive or opportunity for the officers to have done this. Where did that happen relative to the rest of the investigation, finding the body and all of that? Where did this? Well, this evidence, when the evidence was taken, how was that relative to the rest of it? You said the officers wouldn't have had any motive. That's what I'm trying to understand. Okay, so Mr. Atwood was arrested on September 17, 1984, or the victim disappeared, excuse me, on September 17, 1984, and Mr. Atwood was arrested on September 20th. And Mr. Atwood or Mr. Hammond is correct that the agents initially did not notice the pink paint on the bumper when the car was impounded in Kerrville, Texas. And I think that there is a statement, I believe it's in Agent Kloska's statement, which is in the PCR record, saying that he did kind of a cursory photograph of the car and that the car had been pulled forward into something so the front bumper wasn't as evidence. On September 22nd, the car is towed to an impound facility in San Antonio where it is thoroughly searched. That's where they find the pink paint on the bumper. And I believe that at this point Mr. Hammond has conceded that there was, in fact, some pink substance on the bumper that day. So the officers, at a minimum, and Pima County detectives went out, I believe that same day, and I actually have to check my notes, did go out to San Antonio on September 22nd and they observed the paint on that day as well. And the FBI scraped it and sent it off for testing. And so the theory is that the very next day, those same officers took the bumper to Tucson. These are the Pima County officers, so they would have done that in collusion with the FBI agents. I don't see how they could have not been. Because the car was currently in the FBI agent's custody, so they would have had to permit the Pima County officers to remove the bumpers. And then the bumpers get to Tucson on Sunday the 23rd. Yes. And then they go back to San Antonio on the 24th, is that right? I'm not sure the precise date they go back to San Antonio, but at some point before the car is moved back to Tucson, which I think was on the 26th. But the bicycle goes to Washington, D.C., to the FBI lab on the 25th. Yes. So they're saying between, in that interim period, the bike was in the same vicinity as the bumpers. And the only way that could happen would be for the bumpers to be in Arizona where the bike was. Is that your understanding of that? Yes, I agree. So how did—I guess one of the questions that they've brought up is this damage in the bumper. And what is the state's response to that? You're referring to the misalignment in— Yes. Okay. Well, we don't have an explanation for that. Everyone looks at the photographs, and I believe our detectives maybe even saw the misalignment and had no explanation for it. Certainly, Judge Kuhnhauer noticed the misalignment. He said that the misalignment's indisputable. And, you know, I think that's a fair characterization. But simply because that small piece of plastic is dislodged does not in any way signify that that bumper was removed. And Mr. Larmore, the accident reconstruction expert, in his post-conviction interview, he explained that that piece is actually fairly easy to get out of whack. Is he an FBI or a state employee, or is he an outside reconstruction expert, do you know? He was contracted by the prosecutors and outside, I believe, reconstruction. The determination the state court made with respect to Mr. Hill's competency, because he was, at least in the state court's view, not a competent evidence for this, that his life had been spent on aviation rocket failures, et cetera. Was that determination a question of fact or law, in your view? That he wasn't qualified? Yes. Hmm, interesting question. I would think that would be a question of fact, and I also think it would be a question of state evidentiary law, really, whether he was qualified as an expert under state law. But even apart from his qualifications, the court said no images were reflected that support the conclusion that he's drawing. So the court viewed the images himself as well and made that finding. I want to come back and just finish my comments in response to your question, Judge Callahan, about the motive. Given that there was already, now it's not in dispute, that there already was pink paint on the bumper of this car, and given that this child had only been missing less than a week at the time, or maybe about a week at the time of the alleged evidence tampering, and given that the detectives had been advised that California had started parole revocation proceedings against Mr. Atwood, which would seem to rebut Mr. Hammond's suggestion that they were motivated to make sure he stayed in custody because the federal government was going to release him on the kidnapping charge, I simply see no basis why these officers would risk their careers and, in fact, commit a crime to paint or plant additional paint on that bumper when, for all they know, that paint that was already there would have matched. And also, for all they knew, the child could have been recovered either alive or her body be recovered with significant evidence on it to connect someone to her murder. But at this point, we don't have the child, correct? No, we don't have the child. So they have the bike, which was recovered nearby. They have no child. And then they have his car. So that's the only evidence they have. Well, they have his car, but they also have the witnesses who saw him in the area. I understand. Right. Yeah, so they do have some. But I'm talking about physical evidence. Physical evidence, correct. Correct. And, you know, but I think it's critical that they do have some paint that appears to match that bicycle on the car that has been sent off for testing. So, you know, given that, that seems why would you plant additional paint on the bike if there's already paint there that may very well match the bike? And then there was discussion in the trial, there was, it's not before us, but there was testimony in the trial about the paint. Yes. Yes. And I can't remember exactly what the comment was, but that's not part of this record, it's part of the trial record, and they're not contesting that part? It didn't sound like they were contesting that. I believe Mr. Hammond said that the lab report, and I don't independently recall, I apologize, but that the lab report that one of your honors asked about was in the record on appeal. I believe that was his answer. That was the FBI paint report. Right. But there's certainly testimony about it. There's testimony that there was, in fact, not only paint from the bicycle on the car, but there was nickel from the car on the bicycle. So that shows a cross transfer. And also another notable fact for this claim is that the paint that was on the bumper was at precisely the height it would have been had Mr. Atwood's car been weighted down heavily, which it was the day of the offense. During the reconstruction, Mr. Larmor weighted the car down with an equivalent amount of weight that it was carrying at the time of the collision, and it matched up perfectly, which would seem difficult to do with the bumper removed from the car. I'm glad to answer any more questions that the Court has. Otherwise, I would ask that the Court find that the State Court reasonably rejected the paint claim and also affirm Judge Kuhnhauer's findings on the Martinez issue. All right. Thank you. Mr. Hammond, I'll give you four minutes for rebuttal. Let me say two things quickly. One, I beg you to go back and read the pre-sentence report, and I think you will see that, in fact, Mr. Atwood had nothing to lose by having his whole mental health story told, particularly the sexual assault he sustained when he was a child. If you read the pre-sentence report, which is both an Arizona pre-sentence report and one from California from the events out there. Do we evaluate the evidence any differently because it was a judge making that determination as opposed to a jury? Well, I think... I mean, is there a case that would say that? I think the answer is no. And the real question today is would it make a difference to a trier of fact? And I think even in light of Ring, we try to assume that the jury is still in place, and you have cases in the Ninth Circuit that say that. If this goes back, it would go to a jury. Right. It just seems to me that a jury would be really pretty significantly inflamed by some of these things as opposed to a judge perhaps not as inflamed, and I'm just not sure how that fits in or doesn't fit in. Well, this is why... I mean, if a jury hears pedophilia, if a jury hears antisocial personality, if a jury hears a lot of the comments that were made, juries aren't going to like that. I did a lot of jury work. Judges can more compartmentalize those things, and I'm trying to decide. You just said we analyze it the same whether it's a jury or a judge. Well, and I think that that's what our cases say, but in fact the situation Stanton Bloom was facing was one in which he had a judge, and he had to take into account all the things that the judge already knew having sat on this case for like three years. I think it's fanciful. I guess I would find it hard to believe that any defense attorney would introduce some of those things in front of a jury if you went back and had a penalty phase in front of a jury. Well, I can assure you that a death penalty lawyer would do exactly that. Antisocial personality, all of those comments, if all of those things would come in. No, I'm sorry. That's not my point. My point is that a defense lawyer would produce the information of his sexual abuse as a child, not on one occasion but several, and that that occurred at a time that was formative in his life. And then whether these other things get into evidence under Arizona law as proper rebuttal are questions for another day. I think there's a very good chance that they would be kept out. And even if some of them got in. It seems hard that you can open that door and then that everything doesn't come in. That seems pretty difficult. But it's an important part of Arizona law on this question that rebuttal must really rebut the mitigator. It's not just an open door to put in anything that the prosecution would like. Well, but I guess how could not the fact that if you put in that the event at 14 caused PTSD, how could not the comment that I actually liked it and how could that not come in? In direct. I think that might come in, but it would be put in context by a competent mental health professional who would say those kinds of remarks by people who have been sexually abused as children are not all that uncommon. And I think a jury might well understand that. Okay. Thank you. I have another point. I feel badly because I brought these exhibits. Then we better look at them. Well, the judge at the federal hearing said that he could tell himself, just looking at the pictures, that in fact the damage done to the underside of the car, now we're talking about that. We're talking about the gravel pan at this point. Yes. Was done at the time of the events in question and not at the time of the reconstruction. But we have blown up two of the pictures that the judge talked about in his opinion, and I would suggest to you that anybody looking carefully at these would say they're not the same. The pictures taken on the lift in San Antonio show a very undamaged gravel pan. Those after Mr. Larmore's reconstruction have many more dents. This area is indented. There are paint chips all over the place. And there are lots of other photographs that were in the record of the underside of that car taken in San Antonio that show there really was no damage. But that's why it's so important to have an evidentiary hearing. Thank you. Thank you. I would like to thank both counsel, both for the argument and the very careful briefing in this case. The case of Frank Jealous at Wood v. Ryan is submitted and we're adjourned for the morning.
judges: McKeown, Callahan, Ikuta